THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9
UNITED STATES OF AMERICA, ex
rel., RICHARD J. KLEIN,

CASE NO. C09-1342-JCC

10

11
                          Plaintiff,

ORDER ON PARTIES' MOTIONS
FOR PARTIAL SUMMARY
JUDGMENT

12
            v.

13
OMEROS CORPORATION, a

14
Washington corporation, and GREGORY
DEMOPULOS, an individual,

15
                          Defendants.

16

17
This matter comes before the Court on Plaintiff's and Defendants' motions for partial

18
summary judgment (Dkt. Nos. 296 & 304). Having thoroughly considered the parties' briefing

19
and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS

20
summary judgment for Plaintiff Richard Klein on Defendant Gregory Demopulos' defamation

21
counterclaim, except as to Klein's posting of a biotech article about Defendant Omeros

22
Corporation on Yahoo! Finance's stock message board, and otherwise DENIES both parties'

23
motions, for the reasons explained herein.

24
I.    SUMMARY JUDGMENT STANDARD

25
        Summary judgment is appropriate where there is no genuine issue of material fact and the

26
moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party

bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the opposing party must show that there is a genuine issue of fact for trial. *Id.* at 331–33 & n.3. The Court resolves reasonable doubts as to the existence of material facts against the moving party and draws inferences in the light most favorable to the opposing party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## II.   *QUI TAM* CLAIMS

### A.   SBIR Eligibility Claim

Klein brought several *qui tam* claims under the False Claims Act ("FCA") against Omeros and Dr. Demopulos. The Court previously dismissed several of them. (Dkt. No. 242.) Two remain. The first alleges that Omeros is liable under 31 U.S.C. § 3729(a)(1)–(2) for false claims submitted to the United States by Nura, Inc., a company purchased by a subsidiary of Omeros in 2006. Nura certified that it was a "small business" when it applied to transfer to itself (from a company it had purchased) a Small Business Innovation Research ("SBIR") program grant (the "Anxiety Grant"), even though under the applicable regulations it was ineligible for the grant because it was majority-owned by venture capital firms. Klein alleges that Nura knew it was ineligible, and that Omeros is liable for Nura's false claims as Nura's successor. Klein and Omeros both move for summary judgment on this claim.

### 1.   Statute of Limitations

Omeros argues that Klein's SBIR eligibility claim is barred by the FCA's statute of limitations. That statute provides:

> A civil action under section 3730 [for false claims] may not be brought—
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b). Omeros argues that the § 3731(b)(2) tolling provision is not available to Klein because he is not an "official of the United States," and so § 3731(b)(1) bars Klein's claim because he filed his complaint more than six years after the latest alleged violation occurred. In *United States, ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211 (9th Cir. 1996), the Ninth Circuit held that the § 3731(b)(2) tolling provision is available not only to the United States but also to *qui tam* plaintiffs like Klein, and that "as to the *qui tam* plaintiff, the three-year extension of the statute of limitations begins to run once [the] *qui tam* plaintiff knows or reasonably should have known the facts material to his right of action." *Id.* at 1217–18. Omeros argues that the U.S. Supreme Court implicitly overruled *Hyatt* in *United States, ex rel. Eisenstein v. City of New York*, 556 U.S. 928 (2009). In *Eisenstein*, the Supreme Court held that when the United States has declined to intervene in a privately-initiated FCA action, it is not a "party" to the litigation for purposes of Federal Rule of Appellate Procedure 4(a)(1) and 28 U.S.C. § 2107, which allow sixty days to file a notice of appeal (rather than the default thirty) if one of the "parties" to the lawsuit is the United States. *Id.* at 937. This is so, it held, despite the fact that the United States is the "real party in interest" to a *qui tam* lawsuit in which it has declined to intervene. *Id.* at 935.

*Eisenstein* did not implicitly overrule *Hyatt*. To implicitly overrule a case, "the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). The *Hyatt* court's determination that § 3731(b)(2)'s tolling provision is available to *qui tam* plaintiffs did not rely on the assumption that the United States is a party to an FCA suit in which it has declined to intervene, or that the *qui tam* plaintiff otherwise "stands in the shoes" of the United States. Instead, it relied on the statutory language and structure of the FCA:

> Section 3731(b) delineates the statute of limitations for a "civil action under section 3730." No distinction is made between civil actions brought by the government under § 3730(a) and those brought by *qui tam* plaintiffs under

1
2
3

> § 3730(b). Indeed, there is nothing in the entire statute of limitations subsection which differentiates between private and government plaintiffs at all. If Congress had intended the tolling provisions of § 3731(b)(2) to apply solely to suits brought by the Attorney General, it could have easily expressed its specific intent.

4    91 F.3d at 1214. Thus, *Eisenstein* did not "undercut the theory or reasoning underlying" *Hyatt*.

5    *Miller*, 335 F.3d at 900. *Hyatt*'s holding that the statutory language of the FCA evinces

6    Congress' intent that the tolling provision apply to *qui tam* plaintiffs is not irreconcilable with

7    *Eisenstein*'s holding that the United States is not a "party" under Rule 4(a)(1) and 28 U.S.C.

8    § 2107 to a *qui tam* lawsuit in which it has declined to intervene. The statute of limitations does

9    not bar Klein's SBIR eligibility claim.

10                      **2.      Successor Liability**

11          Klein argues that Omeros is liable for Nura's alleged false certifications through the

12    federal common law of successor liability, and that an expanded version of such liability—

13    traditionally applied in cases involving violations of federal labor laws—applies.

14          "[F]ederal law governs questions involving the rights of the United States arising under

15    nationwide federal programs" like the FCA. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715,

16    726 (1979). But whether, in giving content to that federal law where the statutory scheme is

17    silent, the court should "adopt state law or [] fashion a nationwide federal rule is a matter of

18    judicial policy." *Id.* at 728. The court considers (1) whether the federal program, by its very

19    nature, requires uniformity; (2) whether application of state law would frustrate specific

20    objectives of the federal program; and (3) whether application of a uniform federal rule would

21    disrupt existing commercial relationships based on state law. *Id.* at 728–29. "[M]atters left

22    unaddressed in [] a [federal statutory] scheme are presumably left subject to the disposition

23    provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994); *see Atchison,

24    Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362 (9th Cir. 1997)

25    (acknowledging "the heavy burden that a party bears in proving the need for uniformity or

26    proving that state rules conflict with federal policy"). Here, then, the first question is whether the

1  federal common law, or Washington's law, of successor liability applies to Klein's *qui tam* SBIR

2  eligibility claim.

3        Klein does not address this question; rather, he assumes that federal common law applies.

4  Meanwhile, Omeros addresses only Klein's argument that the *expanded* version of the federal

5  common law of successor liability applies, without first addressing the question of whether state

6  or federal common law applies. Fortunately, the Court need not address this question. If federal

7  common law applies, the traditional exceptions to successor non-liability—*not* the expanded

8  exception advocated by Klein—apply (*see infra*), and the traditional exceptions under federal

9  common law are identical to those under Washington law:

> [A]sset purchasers are not liable as successor corporations unless:
> (1) The purchasing corporation expressly or impliedly agrees to assume the liability;
> (2) The transaction amounts to a "de-facto" consolidation or merger;
> (3) The purchasing corporation is merely a continuation of the selling corporation; or
> (4) The transaction was fraudulently entered into in order to escape liability.

15  *Atchison*, 159 F.3d at 361; *see Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc.*, 209 P.3d

16  863, 868 (Wash. 2009) (same under Washington law).

17        Under the National Labor Relations Act ("NLRA") and several other federal labor acts,

18  courts have applied a federal common law exception to the general rule of successor non-liability

19  that is broader than the four traditional exceptions discussed above: "[S]uccessor liability can

20  attach when 1) the subsequent employer was a bona fide successor," *i.e.*, there was a sufficient

21  "degree of business continuity between the successor and predecessor"; and "2) the subsequent

22  employer had notice of the potential liability." *Steinbach v. Hubbard*, 51 F.3d 843, 845–46 (9th

23  Cir. 1995); *see E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 747–48 (7th Cir. 1994). "The reason for

24  this special federal common law doctrine of successor liability—this departure from the more

25  limited approach of the common law generally—is a little elusive." *G-K-G*, 39 F.3d at 748. It

26  was "originally adopted under the NLRA to avoid labor unrest and provide some protection for

1    employees against the effects of a sudden change in the employment relationship" and has since

2    been "extend[ded] . . . to other [labor] contexts . . . in order to vindicate important statutory

3    policies favoring employee protection." *Hubbard*, 51 F.3d at 845. Klein argues that (assuming

4    federal common law applies) this *broader* exception to the general rule of successor non-liability

5    applies to *qui tam* claims under the FCA. The Ninth Circuit rejected a similar argument in

6    *Atchison*. There, the plaintiff in a Comprehensive Environmental Response, Compensation, and

7    Liability Act ("CERCLA") case asked the court to "extend the 'mere continuation' exception" to

8    successor non-liability "to include the broader notion of a 'substantial continuation.'" *Atchison*,

9    159 F.3d at 364. The court declined. It held that the "four traditional exceptions to non-liability

10   of asset purchasers . . . are adequate to protect CERCLA's goal of obtaining cleanup costs from

11   responsible parties." *Id.*

12           So here. Klein points the Court to no clear expression of intent on the part of Congress

13   for the four traditional exceptions to successor non-liability not to apply under the FCA. *See,*

14   *e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 70 (1998) (rejecting a reading of CERCLA as

15   creating a "relaxed, CERCLA-specific [corporate veil-piercing] rule of derivative liability that

16   would banish traditional standards and expectations from the law of CERCLA liability" because

17   "such a rule does not arise from congressional silence, and CERCLA's silence is dispositive").

18   Klein makes no argument for why the four traditional exceptions do not adequately protect the

19   FCA's goal of preventing fraud on the government, beyond generically asserting that "the FCA

20   is designed to serve a broad, remedial interest in preventing fraud against the federal

21   government." (Dkt. No. 323 at 5.) But the same kind of generic assertion applies equally to

22   CERCLA. "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is

23   potentially responsible for hazardous-waste contamination may be forced to contribute to the

24   costs of the environmental cleanup." *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d

25   440, 443 (9th Cir. 2011) (quoting *Bestfoods*, 524 U.S. at 56 n.1) (indications of alteration

26   omitted). Congress' intent to capture every potential wrongdoer with CERCLA was not enough

1    to convince the Supreme Court to relax the traditional standards required to pierce the corporate

2    veil. *Bestfoods*, 524 U.S. at 70. And it was not enough to convince the Ninth Circuit to broaden

3    the exceptions to successor non-liability. *Atchison*, 159 F.3d at 364. Klein has not shown that

4    Congress' intent for the FCA to sweep broadly is enough here. As the Second Circuit has

5    explained, "the substantial continuity doctrine is . . . particular to the labor law context and

6    therefore ha[s] not been and cannot easily be extended to other areas of federal common law."

7    *New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 686 (2d Cir. 2003). The four traditional

8    exceptions apply here. *See, e.g.*, *United States, ex rel. Pilecki-Simko v. Chubb Institute*, No. 06–

9    3562, 2010 WL 1076228, at *15–16 (D. N.J. Mar. 22, 2010) (applying New Jersey's four

10   traditional exceptions to successor non-liability to FCA claim).

11         Unfortunately, the parties' briefing does not adequately address whether any of these four

12   exceptions to successor non-liability applies. Instead, they argue over whether the broader—and

13   inapplicable—exception under federal labor statutes applies (and whether there is a genuine issue

14   of material fact as to that exception's two elements), and whether in the alternative Omeros'

15   corporate veil should be pierced (an inquiry distinct from the successor liability inquiry). The

16   Court will not decide the parties' summary judgment motions on such misfired briefing. Klein's

17   and Omeros' motions for summary judgment on Klein's *qui tam* SBIR eligibility claim are

18   DENIED. Having so decided, the Court need not reach Klein's argument that there is no genuine

19   issue of material fact as to the scienter element of this claim. And having not ruled out the

20   possibility of Omeros' liability as a successor to Nura, the Court will not address Klein's

21   alternative request for leave to add Nura as a defendant.

22         In his response to Defendants' motion, Klein agreed to dismiss his SBIR eligibility claim

23   against Dr. Demopulos and his 31 U.S.C § 3729(a)(7) claim against both Defendants. (Dkt. No.

24   327 at 2 n.1.) The Court therefore does not address Defendants' arguments for summary

25   judgment on those claims.

26

**B.     Timekeeping Claim**

In Klein's second remaining *qui tam* claim, he alleges that Dr. Demopulos instructed employees to falsely record time on the Anxiety Grant. Dr. Demopulos moves for summary judgment on this claim. He argues that the only evidence supporting the claim—Klein's testimony that another employee, Dr. Bergmann, told Klein that Dr. Demopulos told Dr. Bergmann to falsely record time spent on the grant—is inadmissible hearsay. Klein responds that the testimony is admissible under Federal Rule of Evidence 801(d)(2)(D). Rule 801(d)(2)(D) provides that a statement offered against an opposing party that was made by the party's agent or employee on a matter within the scope of that relationship and while it existed is not hearsay. "Under circumstances where an employee's superior has instructed the employee to act in furtherance of a fraudulent scheme, statements made by the employee relating to that scheme are admissible against the superior under Fed. R. Evid. 801(d)(2)(D)." *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1519 (9th Cir. 1991) (citing *United States v. Gibson*, 690 F.2d 697, 701 (9th Cir. 1982)). Dr. Demopulos responds that "[i]t cannot . . . have been the intention of the [*Sunset Bay*] court to make such a wholesale exception to Rule 801(d)(2)(D)[']s" requirement that the speaker be an "agent" or "employee." (Dkt. No. 340 at 7.)  But *Sunset Bay* creates no such "wholesale exception." In the circumstances covered by the *Sunset Bay* rule, the superior is treating the speaker as the superior's *agent* for carrying out the superior's fraudulent scheme. *See Gibson*, 690 F.2d at 701; *see, e.g.*, *Sunset Bay*, 944 F.2d at 1519 ("Since Nosaka was allegedly instructed by his superior Jamieson to cover up a diversion of funds—clearly an instruction to act in furtherance of a fraudulent scheme—his statements to Zetz and Alfaro about the instruction are admissible against Jamieson."). Under *Sunset Bay*, Klein's testimony is admissible.

Dr. Demopulos argues that, even if the evidence is admissible, it is so weak that summary judgment should still be granted for him. To the contrary, the evidence presents the classic he-said, she-said scenario: Klein will testify that Dr. Bergmann told him that Dr. Demopulos instructed him to falsify time records, and Drs. Bergmann and Demopulos will testify to the

1    contrary. The jury may decide whom to believe. Summary judgment for Dr. Demopulos on

2    Klein's *qui tam* timekeeping claim is DENIED.

3    **III.   WRONGFUL DISCHARGE CLAIM**

4        Klein alleges four instances of protected activity he engaged in for which he claims

5    Omeros discharged him in violation of public policy. The first three occurred in November 2008.

6    First, he reported to Omeros' audit committee that Dr. Demopulos refused to institute Klein's

7    recommended signatory authority policy, which would have required Klein (the CFO) to approve

8    large expenditures of company funds. Second, he reported that Omeros' controller submitted two

9    years' worth of claimed business expenses late, which Klein was concerned would require the

10   restatement of prior financial reports. Third, he reported that he had just learned that Omeros

11   owed the Washington State Department of Revenue an $85,000 fine that was six months overdue

12   and had not been disclosed in the company's prior financial statements. Finally, in December

13   2008, he reported that Omeros senior management had instructed employees to falsely record

14   their time to the Anxiety Grant. Omeros moves for summary judgment on these claims.

15       To satisfy the elements of a cause of action for wrongful discharge in violation of public

16   policy, the "plaintiff must prove (1) the existence of a clear public policy (*clarity* element); (2)

17   that discouraging the conduct in which he or she engaged would jeopardize the public policy

18   (*jeopardy* element); and (3) that the public-policy-linked conduct caused the dismissal (*causation*

19   element)." *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 125 P.3d 119, 125 (Wash. 2005)

20   (quotation marks and indications of alteration omitted). Omeros argues that Klein's claim of

21   wrongful discharge on the basis of his false timekeeping report fails as a matter of law because

22   the FCA provides adequate means to protect the public policy of discouraging fraud on the

23   government. *See Korslund*, 125 P.3d at 126 (in order to establish jeopardy, plaintiff "must show

24   that other means of promoting the public policy are inadequate"). In response, Klein argues that

25   his termination on the alleged basis of his false timekeeping report jeopardized *other* public

26   policies in addition to those served by the FCA: "protecting the integrity of the securities markets

and protecting investors"—policies evidenced by the federal Securities Act of 1933 (the "1933 Act") and the Washington State Securities Act ("WSSA"). He also argues that the other three reports he made to the audit committee (in November 2008) jeopardized those same public policies. In response, Omeros argues that Klein has cast the public policies evidenced by the 1933 Act and WSSA too broadly: Those acts do not "clearly" evidence a public policy of "protecting the integrity of the securities markets and protecting investors"; rather, they merely "proscribe[] fraud in connection with the purchase or sale of securities." (Dkt. No. 340 at 9.) To the contrary, in the words of the Washington Supreme Court, "the purpose of federal securities laws is to maintain the integrity of the secondary securities markets and to enforce disclosure, [and] the WSSA is intended to protect investors," and that court "has construed the WSSA broadly." *Haberman v. Wash. Public Power Supply Sys.*, 744 P.2d 1032, 1049 (Wash. 1987); *see, e.g.*, *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1090 (Wash. 1984) (allegations that plaintiff was fired for "instituting an accurate accounting program in compliance with the Foreign Corrupt Practices Act" satisfied the clarity element because "[t]he Foreign Corrupt Practices Act is a clear expression of public policy that bribery of foreign officials is contrary to the public interest and that specific companies, St. Regis for one, must institute accounting practices to ensure that this public policy is advanced").

Omeros replies that Klein "has not shown that the alleged misconduct in his four reports . . . violated the letter or policy of either [the 1933 Act or the WSSA]." (Dkt. No. 340 at 10.) But Klein need not prove that. The jeopardy element requires the plaintiff to "prove that his or her *dismissal* violates [or jeopardizes] a clear mandate of public policy," not that the employer's alleged *misconduct* did. *Hubbard v. Spokane County*, 50 P.3d 602, 607 n.16 (Wash. 2002) (quotation marks omitted and emphasis added); *see id.* at 609–10. All of Omeros' arguments for summary judgment on Klein's unlawful discharge claim fail. Its motion as to this claim is DENIED.

1    **IV.    BREACH OF PROMISE CLAIM**

2            Klein's complaint includes a claim for breach of a promise of specific treatment in a

3    specific situation, based on alleged promises contained in Omeros' whistleblower policy. That

4    policy requires its employees to report instances of "questionable accounting, internal accounting

5    controls, or auditing matters, or the reporting of fraudulent financial information." (Dkt. No. 306

6    Ex. W at 2.) It further provides, "We strictly prohibit any discrimination, retaliation, or

7    harassment against any person who reports" such incidents. (*Id.* Ex. W at 3.) Klein alleges that

8    he relied on the policy's assurances against discrimination, retaliation, or harassment in making

9    the four reports discussed above and in not securing alternative employment thereafter, and that

10   Omeros breached those assurances when it terminated him and subjected him to other adverse

11   employment actions in retaliation for his reports. To establish a claim for breach of promise of

12   specific treatment in a specific situation, the plaintiff must show that (1) a statement or

13   statements in an employee handbook or similar document create a promise of specific treatment

14   in specific situations; (2) the employee justifiably relied on the promise; and (3) the promise was

15   breached. *Korslund*, 125 P.3d at 128.

16           Omeros moves for summary judgment as to Klein's three November 2008 reports. First,

17   Omeros argues that the "purported wrongdoing" Klein reported in November does not fall into

18   the category of "questionable accounting, internal accounting controls, or auditing matters, or the

19   reporting of fraudulent financial information." The Encyclopedia of Banking and Finance defines

20   "accounting controls" as follows:

21           Accounting controls includes the plan of organization and the procedures and
22           records dealing with the broad objectives of safeguarding assets and improving
             the reliability of financial records required for the preparation of financial
23           statements. Accounting controls are concerned primarily with systems of
             authorization and approval, controls over assets, internal auditing procedures, and
24           other financial matters. It is management's responsibility to establish and
             maintain an appropriate system of internal accounting control.
25

26   Charles J. Woelfel, Encyclopedia of Banking & Finance 10 (10th ed. 1994). The alleged activity

ORDER ON PARTIES' MOTIONS FOR PARTIAL
SUMMARY JUDGMENT
PAGE - 11

1  Klein reported in November evidenced questionable internal accounting controls as defined

2  above. The company's lack of an official dual-signature policy requiring the CFO to sign off on

3  large funds transfers, and the controller's failure to timely disclose an $85,000 assessment

4  Omeros owed the Department of Revenue and his late submission of expense reports (both of

5  which Klein was concerned had not been timely disclosed in Omeros' financial statements) all

6  implicate "procedures and records dealing with the broad objectives of safeguarding assets and

7  improving the reliability of financial records required for the preparation of [Omeros'] financial

8  statements," "systems of authorization and approval," or "controls over assets." Woelfel at 10.

9  Omeros claims that Klein "does not dispute that he knew at the time of his report that the

10  [$85,000] assessment arose from a misdirected fax"—*i.e.*, a simple mistake and not a

11  questionable internal accounting control. (Dkt. No. 340 at 11.) But Klein was allegedly

12  concerned that the controller "had been aware of the [overdue assessment] but had failed to bring

13  it to Klein's attention." (Dkt. No. 327 at 26.) That is a concern about "procedures . . . dealing

14  with improving the reliability of financial records." Woelfel at 10.

15       Next, Omeros argues that Klein cannot show the justifiable reliance element because "the

16  issues he was reporting were issues he was required to oversee and manage," and so as a matter

17  of law "he cannot claim that he relied upon the Policy protections in doing so." (Dkt. No. 304 at

18  31.) But whether Klein relied on the policy protections is a question of fact. That he was the CFO

19  does not preclude a jury finding that he relied on the policy protections in making the reports.

20  Omeros also contends that Klein has presented no evidence that he in fact relied on the policy

21  protections when he made the reports. But even if he did not rely on those protections when he

22  *made* the reports, a reasonable jury could conclude he relied on the protections when he *declined*

23  *a job offer* with another company and chose to remain with Omeros through the IPO. (Dkt. No.

24  329 Ex. D at 108:18–20.) Contrary to Omeros' assertions, given this evidence, there is a genuine

25  issue of material fact as to whether Klein was, as Omeros claims, "planning for his departure

26  from Omeros" (Dkt. No. 304 at 33) such that he cannot establish justifiable reliance.

1    Omeros next argues that it "effectively disclaimed any modification of the at-will

2  relationship" in the employee handbook, which states:

3        Omeros is an at-will employer. This means that . . . you or the corporation may
4        terminate the employment relationship at any time, for any reason . . . . Nothing in
         this employee handbook or in any document or statement, written or oral, shall
5        limit the right to terminate employment-at-will.

6  (Dkt. No. 306 Ex. Y at 13.) *Swanson v. Liquid Air Corp.*, 826 P.2d 664 (Wash. 1992) forecloses

7  Omeros' argument. The disclaimer at issue in that case, like the disclaimer here, "purport[ed] to

8  conclusively establish that all employees are terminable at will . . . and that nothing defendant

9  ever has done or ever will do by way of promises to employees can constitute a binding

10 obligation on its part . . . ." *Id.* at 674. The court "reject[ed] the premise that this disclaimer can,

11 as a matter of law, effectively serve as an eternal escape hatch for an employer who may then

12 make whatever unenforceable promises of working conditions it is to its benefit to make"

13 because "[a]n employer's inconsistent representations can negate the effect of a disclaimer[.]" *Id.*

14 As in *Swanson*,

15        there is a fact question here as to whether . . . the disclaimer was modified or
16        contradicted by terms in the [whistleblower policy] which the parties intended to
         be terms of the employment relationship despite the [] disclaimer. All of the
17        circumstances, and the representations and practices of the employer must be
         examined in order to determine the effect of the disclaimer.
18

19 *Id.* at 676. The jury must make that examination here.

20        Finally, Omeros argues that Klein cannot show that he was treated any differently after

21 he made the reports. But Klein stated in his deposition that Dr. Demopulos became "upset" with

22 him for reporting the $85,000 assessment (Dkt. No. 306 Ex. H at 15:11) and that "there just

23 seemed to be constant retaliation" and "significant hostility toward" him as a result of that report

24 (*Id.* Ex. H at 15:20–16:1); that "every single time" he reported an issue to the audit committee,

25 "[Dr. Demopulos] was very upset with [Klein]" (*Id.* Ex. H at 19:6); and that "by the second

26 time" (when he reported the signature policy issue), Dr. Demopulos "sort of screamed at [Klein]"

1  (*Id.* Ex. H at 19:7–8) and "yell[ed] in [his] face," (*Id.* Ex. H at 20:7) and that "the similar pattern"

2  of "the hostility and the exclusion" "escalated over time from that time forward" (*Id.* Ex. H at

3  20:24–21:2). A reasonable jury could find that such treatment constituted "discrimination,

4  retaliation, or harassment" under the whistleblower policy. A reasonable jury could also find that

5  Klein's ultimate termination was retaliation for all four of his reports, including the three on

6  which Omeros moves for summary judgment.

7          There are genuine issues of material fact as to each of the elements of the breach-of-

8  promise claim. Summary judgment for Omeros is DENIED.

9  **V.      DEFAMATION COUNTERCLAIM**

10         Dr. Demopulos alleges that Klein published several defamatory statements about Dr.

11  Demopulos on the Web and to third parties. Allegedly, Klein said that Dr. Demopulos told

12  employees to falsely record time to the Anxiety grant, that Dr. Demopulos attempted to avoid

13  paying income tax, and that he earned $6 million as CEO of Omeros in 2007, all of which are

14  false. Dr. Demopulos further alleges that these statements were defamatory *per se*, *i.e.*,

15  actionable without proof of special damages, because they injured him in his business, trade, or

16  profession.

17         Under Washington law, a plaintiff alleging defamation must prove falsity, an

18  unprivileged communication, fault, and damages. *Commodore v. Univ. Mech. Contractors, Inc.*,

19  839 P.2d 314, 320 (Wash. 1992). The parties dispute what showing Dr. Demopulos must make to

20  be entitled to a presumption of damages. Klein argues Dr. Demopulos must prove actual malice.

21  Dr. Demopulos contends that the defamatory statements did not involve a matter of public

22  concern and so "presumed damages . . . without proof of actual malice may be available." (Dkt.

23  No. 315 at 29 (citing *Maison de France, Ltd. v. Mai Oui!, Inc.*, 108 P.3d 787, 798 (Wash. Ct.

24  App. 2005)).) Klein's statements involved a matter of public concern: executive pay and

25  adherence to the tax laws, and the false recording of time on a grant from the U.S. government.

26  *See*, *e.g.*, *Alpine Indus., Computers, Inc. v. Cowles Publ'g Co.*, 57 P.3d 1178, 1191 (Wash. Ct.

1   App. 2002) (holding that a "story relat[ing] to a court decision resolving an intellectual property

2   dispute between a major software manufacturer and a local retailer" was a matter of public

3   concern because, although, "[v]iewed narrowly, the story pertains to a private dispute between

4   two business entities[,] [i]n a broader context, . . . the dispute touches on a matter of public

5   importance, software piracy," and "[i]n an age where the use of personal computers is

6   widespread, the retail distribution of pirated software is a matter of acute importance to general

7   consumers"); *cf., e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762

8   (1985). Because Klein's statements involve matters of public concern, Dr. Demopulos must

9   show actual malice to be entitled to a presumption of damages.

10      Klein moves for summary judgment on all of the alleged defamatory statements. Dr.

11   Demopulos moves for summary judgment on some of them, with respect to the falsity, privilege,

12   and fault elements only.

13      **A.   Yahoo! Finance Stock Message Board Posts**

14          **1.   "Check out the lawsuit filed by ex CFO…not a pretty picture"**

15      Dr. Demopulos alleges that Klein posted the above statement, along with a URL at which

16   the reader could access Klein's original complaint in this lawsuit, on Yahoo! Finance's stock

17   message board. (Dkt. Nos. 312 at 27 ¶ 29, 306 Ex. Z at 50.) The statement contained in this post

18   is a combination of (1) a true factual assertion (the ex-CFO did file the lawsuit) and (2) an un-

19   actionable opinion ("not a pretty picture"). *See Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d

20   1124, 1133 (W.D. Wash. 2007) (opinions are not actionable as defamation, and whether a

21   statement is an opinion is a question of law). To the extent Dr. Demopulos contends that this

22   statement was an act of defamation, summary judgment for Klein on this counterclaim is

23   GRANTED, and summary judgment for Dr. Demopulos DENIED.

24          **2.   URL**

25      The parties dispute whether Klein's providing a URL at which the reader could access the

26   original complaint was an act of defamation. The allegedly defamatory statements in the

complaint are that several Omeros employees told Klein that Dr. Demopulos instructed them to falsely record time on the Anxiety Grant, and that Dr. Demopulos attempted to avoid paying income tax. "Allegedly libelous statements, spoken or written by a party or counsel in the course of a judicial proceeding [including in pleadings], are absolutely privileged . . . ." *McNeal v. Allen*, 621 P.2d 1285, 1286 (Wash. 1980); *see Demopolis v. Peoples Nat'l Bank of Wash.*, 796 P.2d 426, 429–30 (Wash. Ct. App. 1990). Klein argues that providing the URL did not republish the material in the complaint:

> [U]nder traditional principles of republication, a mere reference to an article, regardless how favorable it is as long as it does not restate the defamatory material, does not republish the material. These traditional principles are as applicable to Internet publication as traditional publication, if not more so. Publishing a favorable reference with a link on the Internet is significantly easier. Taken together, though a link and reference may bring readers' attention to the existence of an article, they do not republish the article.

*In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) (citations omitted). Dr. Demopulos responds that Klein ignores relevant Washington law on point. He cites to *Momah v. Bharti*, 182 P.3d 455 (Wash. Ct. App. 2008), *review granted*, 203 P.3d 378 (Wash. 2009), and *LaMon v. City of Westport*, 723 P.2d 470 (Wash. Ct. App. 1986), for the proposition that providing the URL constituted republication of the pleadings in the complaint. But *Momah* and *LaMon* do not stand for that proposition. In *Momah*, the court held that the defendant could be liable on separate causes of action for defamation, one based on original defamatory statements he made to a newspaper, and the other based on his subsequent posting of the newspaper articles to his website. The defendant thus published the defamatory *content* twice. 182 P.3d at 467–68. Similarly, in *LaMon*, the court stated that the defendant's placement of the plaintiffs' litigation file from an earlier lawsuit (which included allegedly defamatory statements about the plaintiffs) in the public library was, "*assuming communication of its contents* to a third party, a republication of statements made originally in the course of a judicial proceedings" and could "make the [defendant] liable although the original publisher is protected by a privilege." 723

P.2d at 473 (emphasis added). In both *Momah* and *LaMon*, a finding of republication hinged on the defendant's communication of the *contents* of the original, allegedly defamatory statements. Here, Klein merely provided a URL, or reference, to such statements. He did not republish any of the complaint's contents. *Momah* and *LaMon* are distinguishable.

Another federal district court confronted with similar facts came to the same conclusion under Kentucky law. In *Salyer v. Southern Poverty Law Center, Inc.*, 701 F. Supp. 2d 912 (W.D. Ky. 2009), the defendant had published a defamatory article about the plaintiff. The defendant later published more articles that referenced the original article and included hyperlinks to it. The question was whether the reference plus hyperlink constituted "republication" of the original article such that it was a separate act of defamation. The court held that it did not. It first observed that the new articles, like Klein's posting here, made no specific mention of [the defamation] Plaintiff." *Id.* at 915. It then observed:

> It appears that the common thread of traditional republication is that it *presents the material, in its entirety*, before a new audience. A mere reference to a previously published article does not do that. While it may call the *existence* of the article to the attention of a new audience, it does not present the *defamatory contents* of the article to that audience. Therefore, a reference, without more, is not properly a republication.

*Id.* at 916 (first emphasis added). The court went on to hold that the hyperlink was more analogous to a reference than to a separate publication: "[T]he hyperlink is simply a new means for accessing the referenced article. Making access to the referenced article easier does not appear to warrant a different conclusion from the analysis of a basic reference." *Id.* at 917; *accord Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007) (in case applying California law, "Plaintiff cites no authority holding that providing links to statements already published on the Web, without more, republishes those statements"); *Goforth v. Avemco Life Ins. Co.*, 368 F.2d 25, 29 n.7 (5th Cir. 1966) (under North Carolina law, "a mere reference to another writing which contains

1   defamatory matter does not constitute an actionable repetition or republication of that libelous

2   material").

3      The same "common thread" observed in *Salyer* runs through Washington republication

4   law. *See, e.g.*, *Herron v. KING Broad. Co.*, 746 P.2d 295, 300 (Wash. 1987) (adopting

5   Restatement (Second) of Torts § 577A and holding that separate incident of publication occurred

6   when broadcaster revised and read earlier-broadcasted defamatory report); *see Momah*, 182 P.3d

7   at 467 ("the publication reaches a new group and the *repetition* justifies a new cause of action")

8   (quoting Restatement § 577A cmt. d) (emphasis added); Restatement § 578 ("one who *repeats* or

9   otherwise republishes defamatory matter is subject to liability as if he had originally published

10  it") (emphasis added). A mere reference does not directly publish the defamatory material to a

11  new audience. Instead, it tells the new audience where the defamatory material can be found. A

12  URL is not qualitatively different. It tells the reader the address where she can find the material

13  on the Web. This Court holds that Washington courts would agree with *Salyer* and *In re*

14  *Philadelphia* that a mere reference or URL is not a publication of the contents of the materials

15  referred to. Summary judgment for Klein on Dr. Demopulos' counterclaim that Klein defamed

16  him by posting on a stock message board a URL at which the reader could access his original

17  complaint is GRANTED, and summary judgment for Dr. Demopulos is DENIED.

18     **3. "That bull$hit lawsuit seems to be wreaking havoc on the stock since the**

19       **IPO…or do you have another theory on why this thing has tanked to <**

20       **$100M valuation"**

   Klein argues that the above statement, which he posted on the stock message board (Dkt.

21  No. 312 at 28 ¶ 30), is an un-actionable opinion. The Court agrees. It expresses the author's

22  personal view that the lawsuit is meritless and his "theory" that it is the cause of the depressed

23  stock price. Summary judgment for Klein on this counterclaim is GRANTED.

24     **4. Posting Biotech Article**

25     Klein also posted on the stock message board the text of an article entitled, "Scandal

26

Provides Another Reason Omeros Might Not Be the Best Biotech IPO Bellwether." Dr.

Demopulos' counterclaim alleges that the following excerpt from the article was defamatory:

> For example, in 2007, according to Klein's complaint, Demopulos exercised stock options "and attempted to avoid reporting the taxable income or paying the taxes resulting from the option exercise as required by Federal tax law." After Klein found this out, his complaint says, he required Demopulos to report the taxable income to the IRS.

(Dkt. No. 312 at 28 ¶ 31.) Both Klein and Dr. Demopulos move for summary judgment on this

defamation counterclaim.

Klein first argues that this statement is an un-actionable opinion by virtue of Klein's

posting it on an internet chat board where "postings are filled with colorful language, typos and

exaggerations." (Dkt. No. 296 at 25.) But *Klein's* post is not filled with such things. Klein further

argues that the post is an un-actionable opinion because it does not imply undisclosed facts: "The

article specifically outlines the facts behind the author's contention that Omeros's public offering

was not a 'bellwether.'" (*Id.*; *see Paterson*, 502 F. Supp. 2d at 1134 (whether a statement is an

un-actionable opinion depends on the medium and context, the audience, and whether the

statement implies undisclosed facts).) That may be true, but it also asserts the fact that Dr.

Demopulos attempted to avoid paying taxes.

Klein next argues that the statement is true and thus not defamatory, because "Klein

reasonably believed that Demopulos attempted to avoid paying taxes." (Dkt. No. 296 at 27.) Dr.

Demopulos rightly responds that falsity does not depend on the speaker's reasonable belief. A

statement is provably false if "it falsely describes the act, condition or event that comprises its

subject matter." *Schmalenberg v. Tacoma News, Inc.*, 943 P.2d 350, 357 (Wash. Ct. App. 1997).

If Dr. Demopulos did not in fact attempt to avoid paying taxes, then the statement is false. Here,

there is a genuine issue of fact as to whether Dr. Demopulos attempted to avoid paying taxes,

and by extension whether Klein's statement is true. Viewing the evidence in the light most

favorable to Klein, a jury could infer—from the asserted facts that (1) Dr. Demopulos

1    "surprising[ly]" (to Klein) submitted his exercise notice to Omeros controller Dave Toll without

2    involving Klein, (2) no federal taxes were withheld from the option exercise income, even

3    though such taxes were withheld when Klein exercised stock options, (3) a W-2 was issued to

4    Dr. Demopulos without the income included, (4) Dr. Demopulos' company-issued 1099 also did

5    not include the income, (5) Klein had to "br[ing] that to [Dr. Demopulos'] attention that that was

6    not in accordance with federal tax law," (6) Ernst & Young told Klein that reporting the income

7    either on the W-2 or the 1099 would have been appropriate, and (7) Dr. Demopulos' W-2 was

8    revised to include the income (Dkt. No. 297 Ex. DD at 12–16)—that Dr. Demopulos "attempted

9    to avoid reporting the taxable income or paying the taxes resulting from the option exercise."

10   (Dkt. No. 312 at 28 ¶ 31.) However, viewing the evidence in the light most favorable to Dr.

11   Demopulos, a reasonable jury could also infer—from those asserted facts, plus the asserted facts

12   that (8) Dr. Demopulos does not "routinely follow" when the Omeros "finance department issues

13   their 1099s, or when they do not" and (9) Dr. Demopulos did in fact report the income to the IRS

14   and pay taxes on it (Dkt. No. 319 Ex. I at 3–6)—that Dr. Demopulos did not attempt to avoid

15   reporting the income. Summary judgment for both parties on the asserted basis of there being no

16   genuine issue of material fact as to the falsity element of Dr. Demopulos' defamation

17   counterclaim is thus DENIED.

18        Klein next argues that the privilege for reporting on official actions and proceedings—

19   traditionally afforded to media defendants—applies to the statement. *See Herron v. Tribune

20   Publ'g Co., Inc.*, 736 P.2d 249, 260–61 (Wash. 1987); *Mark v. Seattle Times*, 635 P.2d 1081,

21   1089 (Wash. 1981). But "[a] person cannot confer this privilege upon himself by making the

22   original [privileged] defamatory publication himself and then reporting to other people what he

23   had stated. This is true whether the original publication was privileged or not." Restatement

24   (Second) of Torts § 611. Klein argues that this self-reporting exception to the reporting privilege

25   applies "only if the defamer illegitimately fabricated or orchestrated events so as to appear in a

26   privileged forum in the first place" and that "[t]here is no evidence that Klein put the statements

1    in his Complaint merely to confer on himself a privilege for future publications." (Dkt. No. 323

2    at 13 (citing *Rosenberg v. Helinski*, 616 A.2d 866, 876 (Ct. App. Md. 1992)).) Klein cites to no

3    Washington cases so limiting the Restatement § 611 exception. *See Alpine Indus.*, 57 P.3d at

4    1185 (observing that "the more recent Washington opinions discussing the fair reporting

5    privilege rely to some degree on Section 611 of Restatement (Second) of Torts"). The Court will

6    not allow such a tenuous claim of privilege to prevent a jury from hearing the evidence on Dr.

7    Demopulos' claim.

8           Klein argues that there is no genuine issue of fact as to whether Klein made the tax-

9    evasion statement maliciously, which Dr. Demopulos needs to show to prove defamation *per se*.

10   "'[A]ctual malice' . . . [means] not ill will or spite but rather the publisher's knowledge that his

11   statements are false or his reckless disregard for their falsity." *Tribune Publ'g*, 736 P.2d at 255.

12   "Reckless disregard" means "publication with a high degree of awareness of probable falsity" or

13   that "the defendant in fact entertained serious doubts as to the truth of his publication." *Tilton v.*

14   *Cowles Publ'g Co.*, 459 P.2d 8, 17 (Wash. 1969) (quotation marks and indications of alteration

15   omitted). The finder of fact considers cumulatively such factors as hostility, spite, failure to

16   investigate, and use of unreliable sources. *KING Broad.*, 746 P.2d at 302. Just as there is a

17   genuine issue of fact as to the falsity of Klein's tax-evasion statement, there is also a genuine

18   issue of fact as to whether he made that statement with reckless disregard for its falsity, and thus

19   as to the malice element. Klein argues that Dr. Demopulos "cannot come forward with evidence

20   th[at] Klein subjectively disbelieved the statement[] . . . or that he entertained serious doubts

21   [about] th[e] statement[]." (Dkt. No. 296 at 29.) But a jury could find from the evidence of

22   Klein's hostile and spiteful feelings toward Dr. Demopulos and the limited nature of his

23   investigation into whether Dr. Demopulos in fact attempted to avoid paying taxes that Klein

24   made the statement with reckless disregard for its falsity. For the foregoing reasons, Klein's

25   motion for summary judgment on this counterclaim is DENIED.

26

1

### 5.   "CEO paid over $6 million!!"

2      In response to a thread beginning with "Lawsuit filed by ex-CFO," and in a separate

3  thread under the subject line, "CEO paid $6 million!!!," Klein posted the following:

4      CEO paid over $6 million!! Disclosed in SEC filing 10/2/09 Gregory A.
       Demopulos, M.D. 2008 475,000 — 594,203 25,225 (2) 1,094,428 President,
5      Chief Executive Officer, Chief Medical Officer and Chairman of the Board of
       Directors 2007 474,940 278,011 5,359,554 (3) 178,755 (4) 6,291,260
6

7  (Dkt. No. 312 at 29 ¶ 32.) Both parties move for summary judgment as to this allegedly

8  defamatory statement. Klein argues that the statement is true—it is a verbatim excerpt from an

9  SEC filing—and therefore not an act of defamation. Dr. Demopulos responds that it is false

10  because it leaves out footnotes (1) and (3) in the SEC filing that clarify that about $5.3 million of

11  the $6.3 million was the estimated value of non-cash stock and stock options awarded to Dr.

12  Demopulos that year. (Dkt. No. 297 Ex. BB at 8.) In Washington,

13      [i]n a defamation by omission case, the plaintiff must show with respect to the
14      element of falsity that the communication left a false impression that would be
       contradicted by the inclusion of omitted facts. Merely omitting facts favorable to
15      the plaintiff or facts that the plaintiff thinks should have been included does not
       make a publication false and subject to defamation liability.
16

17  *Mohr v. Grant*, 108 P.3d 768, 776 (Wash. 2005). Here, Klein's statement about Dr. Demopulos'

18  compensation does not leave a false impression that would be contradicted by the inclusion of

19  the omitted footnotes. The statement leaves the impression that Dr. Demopulos was compensated

20  to the tune of $6 million. The footnotes do not contradict that impression. They merely clarify

21  that some of that compensation was not in the form of cash. Summary judgment for Klein on this

22  counterclaim is GRANTED; summary judgment for Dr. Demopulos is DENIED.

23      ### B.      Repetition of Allegations in Complaint to Third Parties

24      Dr. Demopulos' defamation counterclaim contains the allegation that Klein defamed him

25  by "repeat[ing] the false and malicious statements contained in his complaint to [] third parties,"

26  including to Richard Totorica. (Dkt. No. 312 at 29 ¶¶ 33–34.) Klein moves for summary

1    judgment on this claim, arguing that it is impermissibly vague. In response, Dr. Demopulos

2    offers the following excerpts from Klein's deposition:

> Q Have you talked to Richard Totorica about your allegation that Dr. Demopulos
> directed the improper recording of time on the grant?
> A Richard has read the complaint and we've discussed what's in the complaint,
> and that is in the complaint, yes.
> Q And have you discussed that issue with him?
> A Yes.
> . . . .
> Q Now, do you recall having that discussion about the allegation that Dr.
> Demopulos instructed investigators to record time that was not actually spent on
> the grant with anyone else?
> A I discussed what was in the complaint with a lot of people and that was in the
> complaint.

11    (Dkt. No. 315 at 28–29.)

12        Dr. Demopulos' pleadings, taken together with this evidence, fail to state a claim for

13    defamation, let alone create a genuine dispute of fact. "[W]here a plaintiff seeks damages for

14    conduct which is prima facie protected by the First Amendment, the danger that the mere

15    pendency of the action will chill the exercise of First Amendment rights requires more specific

16    allegations than would otherwise be required." *Flowers v. Carville*, 310 F.3d 1118, 1130 (9th

17    Cir. 2002) (quotation marks and indications of alteration omitted); *see, e.g.*, *Harris v. City of

18    Seattle*, 315 F. Supp. 2d 1112, 1123–24 (W.D. Wash 2004) (dismissing plaintiff's defamation

19    claim because "Plaintiff does not specify specific statements by these Defendants that were

20    defamatory"); *Phillips v. World Publ'g Co.*, 822 F. Supp. 2d 1114, 1118 (W.D. Wash. 2011)

21    (dismissing defamation claim because "[n]owhere in the complaint has plaintiff alleged when or

22    where such statements were made, or what statements were actually made by defendant," and

23    concluding that "such scattershot and unsubstantiated allegations cannot withstand a motion to

24    dismiss"). Here, all that Dr. Demopulos' pleadings, taken together with the evidence he has

25    identified, show is that Klein "discussed" the "issue" of his "allegation that Dr. Demopulos

26    directed the improper recording of time on the grant" with Totorica, and that he "discussed what

1    was in the complaint" with "a lot of people." "Discussing" an allegation is not the same thing as

2    republishing it. Dr. Demopulos has not shown that he can prove that Klein *published* to Totorica

3    or others any specific allegedly defamatory statements. Instead, the pleadings and evidence

4    identified above leave the jury to speculate as to whether Klein did in fact publish such

5    statements, and if so, which ones, and to whom—let alone whether he published such statements

6    *with malice*. *See Flowers*, 310 F.3d at 1131 ("Actual malice is a subjective standard that turns on

7    the defendant's state of mind; it is typically proven by evidence beyond the defamatory

8    publication itself."); *British Airways Bd. v. The Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) (in

9    opposing a motion for summary judgment, "[a] mere scintilla of evidence will not do, for a jury

10    is permitted to draw only those inferences of which the evidence is reasonably susceptible; it

11    may not resort to speculation"). Summary judgment for Klein on these third-party defamation

12    counterclaims is GRANTED.

13    **VI.    CONCLUSION**

14        For the foregoing reasons, the parties' cross-motions for summary judgment on Klein's

15    *qui tam* SBIR eligibility claim against Omeros are DENIED; Dr. Demopulos' motion for

16    summary judgment on Klein's *qui tam* false timekeeping claim is DENIED; Omeros' motion for

17    summary judgment on Klein's claim of unlawful discharge in violation of public policy is

18    DENIED; Omeros' motion for summary judgment on Klein's claim of breach of promise is

19    DENIED; Dr. Demopulos' motion for summary judgment on his defamation counterclaim is

20    DENIED; and Klein's motion for summary judgment on the defamation counterclaim is

21    GRANTED except as to his posting of the biotech article about Omeros on the stock message

22    board. (Dkt. Nos. 296 & 304.)

23    //

24    //

25    //

26    //

1    DATED this 15th day of October 2012.

2

3

4

5

6

7                                          _____
                                           John C. Coughenour
8                                          UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26